UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TOD J. WELSCH, | ) | |
| | ) | |
| Plaintiff, | ) | 05-2103 |
| | ) | |
| v. | ) | |
| | ) | |
| P. BERNARDI, J. BLEW, K. ATKINSON, | ) | |
| D. SMALLEY and CITY OF DANVILLE, | ) | |
| ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

In the early morning hours of May 4, 2003, Dawn Welsch ("Dawn") and her boyfriend had an argument, and in the course of that argument, her boyfriend hit her.  Dawn left her house and drove approximately one mile to the home of her father, plaintiff Tod Welsch ("Welsch"), to use the telephone.  Dawn called 911 and reported the altercation.  Dawn told the dispatcher she was calling from 735 Douglas Street, Danville (her father's address).  The dispatcher determined that Dawn did not need medical assistance and learned that Dawn's boyfriend was at 1601 Perrysville Road.  The dispatcher told Dawn that someone would respond to the call.

Dawn then left her father's house and went home.  A short time later, police officer Phillip Bernardi ("Bernardi") arrived at Welsch's home, talked to Welsch, determined that Dawn was not there, and then left.   Minutes later, Dawn returned to her father's house and called 911 to cancel the earlier request for assistance.  The dispatcher told Dawn the police had just been to her father's house and that she "didn't wanna answer the door or . . ." and Dawn replied, "No, I never . . . Ahm, no, I was here, I had to run down to my house real quick and . . ." At that point, the dispatcher heard a male voice in the background.  Dawn and the unidentified man began to argue.  The dispatcher asked, "Who's yelling and why?" and Dawn replied, "My father's yelling at me because he's drunk."[1]  The argument continued for a few more moments, until Dawn told the dispatcher, "Just don't worry about it, ok?" and hung up. Dawn then left her father's house and went back home.

---

[1] Welsch denies he was drunk, though he admits he had been drinking that evening; he consumed four to five beers in two to three hours and stopped drinking between10:30 and 11:30 p.m.  Welsch Dep. at 14-16.  Dawn described her father as drunk or intoxicated.  911 Transcribed Statement at 1, Dawn Dep. 21.  When Bernardi responded to the first phone call, he noticed that Welsch "appeared to be intoxicated . . . . "His speech was a little slurred.  I smelled the alcohol about the person on Mr. Welsch."  Bernardi Dep. 34; *see also* Blew Dep. 10.

1

The dispatcher put out a second call to the police officers, telling them that Dawn had called from the Douglas Street address to cancel the first request for assistance. The dispatcher reported that Welsch had been yelling at Dawn during the second phone call, and Bernardi responded, "Well, that's who I talked to there. He was denying she was there."[2] Bernardi was just a few blocks from Welsch's home and was at his door "several minutes later."[3] Bernardi and one or more of the other individual defendants[4] went to the Douglas Street address and knocked on the door. Welsch came to the door and Bernardi demanded to know where Dawn was. Welsch said that Dawn was not there and told the officers that Dawn was at her home. The police officers then asked to check the house. Welsch said they would need a warrant to do so. According to Welsch, the police officers then came into the house forcefully, hit him in the face, jumped on him, ran him into a chest of drawers, kneed him in his right ear, handcuffed him, and took him to the police station. Welsch was charged with resisting a peace officer. The charge was later dismissed.

Welsch brings this action pursuant to 42 U.S.C. § 1983 and state law, asserting claims against the police officers of excessive force, battery, and willful and wanton conduct. Welsch also claims that the City of Danville (the "City") has a custom or practice indifferent to the constitutional rights of its citizens by inadequately training its police officers.

PROCEDURAL HISTORY

Welsch's complaint was filed on April 29, 2005. On October 6, 2005, the parties filed a proposed discovery plan, with the completion of discovery scheduled for June 1, 2006 and dispositive motions to be filed by July 5, 2006.

On June 8, 2006, the defendants filed a motion for summary judgment. The plaintiff filed his response twenty-one days thereafter as required by this court's Local Rules. Also on that date, the plaintiff filed a motion to extend the discovery deadline, stating that he'd been unable to depose City employees who had knowledge of the City's customs and practices. The court denied the motion to extend the discovery deadline.

ANALYSIS

---

[2] Welsch knew of Dawn's first visit to his house but he claims he did not know, at that time, that she had used the phone. Welsch Dep. 19. Dawn states that she didn't talk to her father when she went to his house the first time, but that Welsch was near enough to see her use the phone and overhear her end of the conversation with the 911 dispatcher. Dawn Dep. 17.

[3] Welsch Dep. 21. Bernardi said he was "five or six blocks away" when he received the second dispatch, and he arrived at Welsch's home "within a minute or two . . . . Five or six blocks and third shift doesn't take me but 30 seconds to a minute to travel that distance." Bernardi Dep. 46.

[4] The individual defendants are all Danville police officers.

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is proper when "a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must consider the evidence in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The burden of establishing that no genuine issue of material fact exists rests with the movant. *Jakubiec v. Cities Serv. Co.*, 844 F.2d 470, 473 (7th Cir. 1988). Once the movant has done so, the party opposing the motion bears the burden to respond, not simply by resting on the pleadings, but by affirmatively demonstrating that there is a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-324.

In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). "If [the non-movant] does not [meet his burden], summary judgment, if appropriate, shall be entered against [the non-movant]." *See* Fed. R. Civ. P. 56(e).

The defendants argue that they are entitled to summary judgment because (1) they are entitled to qualified immunity on the Section 1983 claims; (2) without a showing of excessive force, the plaintiff cannot prevail on his claims of battery and willful and wanton conduct; and (3) there is no evidence of a custom, policy or practice of inadequate training.

## I. The City's training and supervision of police officers

Welsch alleges the City has a duty to exercise proper supervision, training and control over its police officers to ensure they do not use excessive force during the course of an arrest. Welsch impliedly asserts that the City's custom, policy or practice of inadequate supervision, training and control resulted in the officers' violation of his constitutional rights.

As noted above, Welsch sought an extension of time to conduct discovery on this issue. Welsch filed his claim against the City more than a year before discovery closed. The police officers were deposed on March 17, 2006, two-and-a-half months before discovery closed on June 1, 2006. Welsch never explained why he failed to obtain the needed discovery. In his response to the motion for summary judgment, he states that "it cannot be said affirmatively that no such evidence [against the City] exists" because "the case is still in the discovery phase of trial so that not all of the relevant evidence to [Welsch's] claim against the City . . . is out yet." This assertion amounts to "metaphysical doubt," if that. *See Matsushita*, 475 U.S. at 586.

Furthermore, discovery *had* concluded. The court need not keep open a claim for a plaintiff who does not timely obtain discovery. The court grants summary judgment in favor of

the City.

## II.  Excessive force, battery and willful and wanton conduct

The defendants argue they are entitled to qualified immunity for Welsch's claims of excessive force because the officers' conduct was reasonable and appropriate under the circumstances.  "In order to survive summary judgment on grounds of qualified immunity, a plaintiff must (1) allege violation of a valid legal right and (2) demonstrate that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Abdullahi v. City of Madison*, 423 F.3d 763, 775 (7th Cir. 2005) (*quoting Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

During the course of an arrest or other "seizure" of a free citizen, the force used to detain the individual must be reasonable in a Fourth Amendment context.  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Lawrence v. Kenosha County,* 391 F.3d 837, 843 (7th Cir. 2004).

> [The determination of reasonableness] involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citations and quotation marks omitted). Not surprisingly, this analysis is "not capable of precise definition or mechanical application" but "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citations and quotation marks omitted). *See also Tennessee v. Garner,* 471 U.S. 1, 8-9 (1985) (the relevant question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").  Additionally, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  Finally, "[a]s in other Fourth Amendment contexts, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

*Abdullahi*, 423 F.3d at 768.

It is undisputed that Dawn's two phone calls were placed within minutes of each other. She placed the first phone call at about 1:15 a.m.  The second phone call was received at 1:24

4

a.m.  Between the first and second phone calls, Bernardi was dispatched to the Douglas Street address; waited for Welsch to answer the door; had a brief discussion with Welsch; left the home, and was only five or six blocks away when the dispatcher informed him of the second call.  During those same few minutes,  Dawn called the police, left the house, returned to make the second call, and left again.

 In the first phone call, Dawn identified the address from which she was calling. She did not do so during the second call; however, the defendants submit the affidavit of Victor Vanesse, Director of Communications for the Danville Public Safety Building, where the 911 dispatch center is located.  Vanesse states that all incoming 911 calls display the caller's phone number, the street address of the telephone, and the name of the subscriber.  Given the short amount of time between the two calls originating from the same location, it was reasonable for Bernardi to conclude, when he responded to the second call, that Dawn was at the house.

During the second call, the dispatcher overheard an argument.  The call transcript reads as follows:

Female Caller: I need to cancel one of my calls that I just called in.

9-1-1:  Ok.  Wa' the officers have already been there, did you didn't wanna answer the door or . . .

Female Caller: No, I never . . . Ahm, no, I was here.  I had to run down to my house real quick and . . .

Male Voice: (Unintelligible)

Female Caller: Be quiet, dad.

Male Voice: (Unintelligible) shut up.  I don't need no goddamn cops come in this house.

Female Caller: (Unintelligible)

Male Voice: What?

Female Caller: I'm not.  I'm call . . .

Male Voice: Fuck it. (Unintelligible) cop come down to their (sic) fucking house.

Female Caller: I thought they were didn't weren't gonna come so don't worry about it.

Male Voice: Better shut the fuck up, Dawn.

9-1-1: Who's yelling and why?

5

Female Caller: (Unintelligible) my father.  My father's yelling at me because he's drunk.

Male Voice: (Unintelligible)

Female Caller: And I'm trying to call the cops on somebody else.  But . . .

Male Voice: (Unintelligible) fucking stupid shit that got him killed (sic).  What the fuck is wrong with you, Dawn?  Get the hell off (sic).

Female Caller: (Unintelligible) don't worry about it, ok?

Call disconnected . . .

From the heated argument, the short time between the two phone calls, and Welsch's insistence (twice) that Dawn was not at the house, it was reasonable for the officers to conclude that Dawn might be in the house and in need of assistance – if not from the first 911 call, then possibly from the argument overheard during the second call.  Consequently, it was reasonable for the officers to want to search the house for Dawn.

The parties dispute what happened next.  Not surprisingly, they describe their own conduct as befitting a model of decorum.  Bernardi states he explained to Welsch that he wanted to come into the house and check on Dawn's status because they were concerned about her, but Welsch insisted they needed a warrant and prevented the officers from checking the house by blocking their path with his body.[5]  Welsch implies he was not told why the officers wanted to search the house, but the complaint states otherwise.[6]

 Finally, "after enough arguing" Bernardi told Welsch he was going to be placed under arrest for obstructing a police officer and took hold of Welsch's right arm.  Welsch began to fight and struggle, and Bernardi and Officer Joseph Blew ("Blew") pushed him to the wall and then down to the floor to gain control of Welsch and handcuff him.  Bernardi states that Welsch hit a table or some knickknacks and sustained a small cut or abrasion on his cheek.

In contrast, Welsch states when he told the officers they could not search his house without a warrant, "they proceeded to come into the house forcefully.  I took a couple steps backwards and [Bernardi] hit me on the right cheek with his fist. . . . After he hit me, I fell to the

---

[5] Bernardi Dep. 52; *see also* Blew Dep. 13.

[6] Compl. ¶¶ 11, 27, 40, 54, 69, 82, 96, 111, 124, 138, 153, 166 ("Bernardi returned to the residence again requesting to speak with Dawn and requesting to enter the residence to search for Dawn . . .").

ground.  The officers [as many as four of them[7]] jumped on me, ran me into a chest of drawers . . . [and] kneed me in my right ear."  Welsch Dep. 22-23.  Welsch claims he has ongoing pain in his back, neck and shoulders; ringing in his ears; a scar on his face; chipped teeth; and a phobia about the police.

The genuine issue of material fact in this case is whether the officers exceeded "the amount of force necessary in the particular situation." *Graham*, 490 U.S. at 396-97. The officers describe a situation in which they used a reasonable amount of force to arrest Welsch so they could search the house.  According to Welsch's version of events – which the defendants dispute – the officers used an objectively unreasonable amount of force to arrest him.  A trier of fact must determine which version of events is true.

Accordingly, summary judgment is denied on the excessive force claims.  Since the claims of battery and willful and wanton conduct arise from excessive force, summary judgment must be denied on those claims as well.

<u>CONCLUSION</u>

The defendants' motion for summary judgment [# 20] is granted in part and denied in part.  Summary judgment is granted in favor of the City; it is dismissed from this action.  Summary judgment is denied as to Bernardi, Blew, Atkinson and Smalley.  A final pretrial conference is scheduled for November 7, 2006 at 1:30 p.m by personal appearance.  Jury selection and jury trial are scheduled to begin on November 13, 2006 at 9:00 a.m.

Entered this 2nd day of August, 2006.

**s\Harold A. Baker**
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE

---

[7] Welsch Dep. 21-23.  It is undisputed that Officers Bernardi, Blew, Kevin Atkinson ("Atkinson") and Douglas Smalley ("Smalley") responded to the second call.  The officers state that Bernardi and Blew arrived at the same time.  Atkinson and Smalley arrived after Welsch had been handcuffed, and they assisted in searching the house.  Atkinson Dep. 29-30; Smalley Dep. 4-5; Bernardi Dep. 52; Blew Dep. 8, 15.  The parties do not submit a written version of the 911 dispatch and the court cannot determine when Smalley and Atkinson arrived, other than from the deposition testimony.  Since the officers' testimony conflicts with Welsch's, the court is unable to grant summary judgment for Atkinson and Smalley on the excessive force claim.